deemed to be in the same situation as a second purchaser, according to the decisions in Massachusetts and Maine; and we all know, that a second purchaser is not affected with the title of any third persons in the property, of which he has no notice. In the present case, Hinkley's title was subordinate to that of the tenants, under their prior attachment, and the United States can properly claim, against the tenants, the same rights only that Hinkley himself might claim; for the title of the United States is but a derivative title under Hinkley. The case is not like that of Coffin v. Ray, 1 Metc. [Mass.] 212, where the grantee, under whom the attaching creditor claimed, had notice of the unregistered deed of a prior grantee, and the court held, that as the attaching creditor had no notice of such prior deed at the time of his attachment, although he had before the levy of the execution, he was entitled to hold against the grantee of such prior deed. Here, the United States, at the time of their attachment, either knew, or might have known, of the prior attachment of the defendants, and that Hinkley's deed was not, at that time, recorded. But whether the United States did know, or might have known, of the prior attachment of the tenants, or not, is immaterial, since such knowledge in Hinkley could not have given validity to his title, against the prior attachment of the tenants. And if the United States are to be treated as purchasers at all, they must be treated as purchasers of all Hinkley's rights in the premises, subject to the prior incumbrances thereon. The case of Coffin v. Ray, supra, certainly goes very far, and places the attaching creditor in a better situation, than that of the grantee, under whom he claims title. But it is distinguishable from the present case in the material circumstances, that in that case, the notice created a mere personal equity, affecting the grantee alone, and thus would deprive him of the right to set up his title, as a bona fide purchaser, without notice, against the prior grantee; whereas, in the present case, the attaching creditor, by his prior attachment, acquired a right in rem, and no personal equity whatsoever applies to him, founded upon notice of Hinkley's deed, of which the United States could avail themselves.

Judgment for the tenants.

---

## Case No. 14,716.

UNITED STATES v. CANAL BOAT NO. 68.
[See Case No. 16,027.]

---

## Case No. 14,717.

UNITED STATES v. The CANDACE.

[The case reported under above title in 9 Int. Rev. Rec. 177, is the same as Case No. 2,379.]

## Case No. 14,718.

UNITED STATES v. CANOE.

[5 Hughes, 490.]

Circuit Court, D. Maryland. Nov. 22, 1867.

APPEAL—FINAL DECREE—WAR—PROHIBITION OF COMMERCIAL INTERCOURSE—SEIZURE OF GOLD COIN.

[1. Certain merchandise, together with some gold coin, was seized during a period of insurrection and libeled for condemnation, as about to be transported into the enemy's country. A decree was entered by which the merchandise was condemned and ordered to be sold. The court, in delivering its opinion, stated that the gold could not be condemned, and the decree directed that it should be deposited in the registry, to await further orders. Over two years later, on the petition of a claimant, the gold was ordered to be paid over to him. Held, that the original decree was not final in respect to the gold, and that, consequently, an appeal from the subsequent order might be taken, notwithstanding the fact that more than two years had elapsed since the date of the former decree.]

[2. The act of July 13, 1861, providing for the forfeiture of all "goods and chattels, wares and merchandise" coming from, or proceeding to, the insurrectionary districts, includes gold coin.]

[Appeal from the district court of the United States for the district of Maryland.]

CHASE, Circuit Justice. This cause comes before us on appeal from the district court. The libel charges that a canoe called the "Lapwing," with a lot of goods and chattels, consisting of two canvas sails, seven barrels of borax, and seven hundred and seventy dollars in gold, was, on or about the 20th of July, 1862, proceeding from parts of the United States not in insurrection to a part of Virginia which was in insurrection, and that the canoe and cargo including the gold, were seized by the proper officers for the violation of the act of July 13, 1861 [supra], and the act of May 20, 1862 [12 Stat. 404], prohibiting commercial intercourse between the loyal and rebel states, and thereupon the libel brought for condemnation. No claim was put in on the hearing below for any part of the property seized.

The first decree of the district court recites the facts proved. From this recital it appears that the canoe, with the borax on board, was found lying in a creek in St. Mary's county, in Maryland, and seized on behalf of the United States by a party of cavalry. No person was on board the canoe, but in the woods at a little distance, a man was captured who admitted that he was the owner of the canoe and cargo; that he was a physician residing in Virginia, and that he intended to take the borax to Virginia for sale. The gold was found upon his person. Upon these facts the district court expressed the opinion that all the property except the gold was liable to condemnation, but that the gold was not so liable, and thereupon at the March term, 1864, a decree was made condemning the canoe, the borax and the canvas sails, and directing that the gold be deposited in the registry to await further orders. The decree further di-